## lIN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

| | | |
|---|---|---|
| XINUOS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. _____ |
| | ) | |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| INTERNATIONAL BUSINESS | ) | |
| MACHINES CORP. and RED HAT, | ) | |
| INC. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**COMPLAINT**

## I.   **COMPLAINT**

1.      Plaintiff Xinuos, Inc. ("Xinuos"), for its Complaint against Defendants International Business Machines Corp. ("IBM") and Red Hat, Inc. ("Red Hat") alleges on knowledge as to itself, its own acts and facts known to it and reasonable inferences therefrom, and on information and belief as to all other matters, as follows:

2.      This case is simple.  IBM and Red Hat conspired to illegally corner a market and crush competition.  First, IBM stole Xinuos' intellectual property and used that stolen property to build and sell a product to compete with Xinuos itself.  Second, stolen property in IBM's hand, IBM and Red Hat illegally agreed to divide the relevant market and use their growing market powers to victimize consumers, innovative competitors, and innovation itself.  Third, after IBM and Red Hat launched their conspiracy, IBM then acquired Red Hat to solidify and make permanent their scheme.  Fourth, IBM has been misleading its investors by falsely claiming all infringement claims against IBM regarding the copied code have been waived.

3.      IBM and Red Hat have engaged in this well-worn, anticompetitive conduct in order to corner the market for operating system software that companies rely on to use servers.  Servers are computer hardware designed for various functions, such as data storage or email.  Server operating systems are the software that actually enable companies to use the server hardware to store data, have corporate email, print documents, and many other functions.

4.      Xinuos, IBM, and Red Hat compete by selling to companies their own server operating system software.  IBM's server operating systems, however, depend on code that IBM stole from Xinuos and, until that theft, IBM's products were becoming less attractive and were losing market share.  After IBM stole the code from Xinuos, IBM and Red Hat agreed that Red Hat would take control of the low end of the market, comprised of small and medium sized business, and IBM would take control of the high end of the market, comprised of the largest

companies with the most complex operating system deployments.  Having made this agreement and carried it out, both Red Hat and IBM have engaged in further anticompetitive conduct to help the other corner their respective market sectors.

5.      IBM's motive is straightforward: before it stole Xinuos' software and conspired with Red Hat, its server operating software was becoming less competitive, and IBM was losing market share.  This gravely threatened not only IBM's server operating system business, but also its lucrative business of selling the underlying servers themselves as well as related software and services.  Red Hat's motive is equally clear: in return for ceding the high-end server operating system market, it received IBM's agreement to stay out of the low-end market, as well as its financial, reputational and technological help to dominate that low-end market.

6.      On top of all this, IBM has materially misled its investors, falsely representing in its securities filings that a third-party owns all of the Unix and UnixWare copyrights, and that this third-party has waived any infringement claim against IBM.  IBM mischaracterizes in its securities filings a prior court ruling that found old Unix and UnixWare code, created before September 19, 1995, belonged to the third-party.  IBM's filings make it sound like the third-party was found to own *all* Unix and UnixWare code.  These statements are demonstrably false.  In fact, with regard to Xinuos' code created after September 19, 1995, and which IBM stole, Xinuos owns that code, has never entered into a license agreement with IBM, and has never waived its infringement claims against IBM for stealing that code.

7.      IBM's and Red Hat's unlawful conduct continues to inflict substantial monetary and other harm on Xinuos, has enabled each to charge prices far higher than a competitive market would bear, and has strangled innovation to the point where consumers feel locked into IBM's and Red Hat's server operating systems.  Xinuos brings this action to hold IBM and Red Hat

accountable.

## II.   **NATURE OF THE ACTION**

8.      The modern economy relies on computers.  Every company in the modern economy of any size utilizes servers to meet its computing needs.  Major server hardware manufacturers include IBM, Dell, HPE, Inspur (in a joint venture with IBM), Lenovo (acquired assets from IBM), and Huawei.  For much of the history of enterprise computing, servers have been installed "on premises"—i.e. at a physical location associated with a particular company or data center.  But, over time, the concept of "cloud computing" has emerged, including the IBM Cloud, where servers are managed in a more centralized manner and allocated to business customers.

9.      Servers, like all computers, need operating systems to function.  Server operating systems allow the computer hardware to "run" software applications, enabling the communication between software and hardware.

10.     Once there were many developers of corporate server operating systems but because of abusive practices discussed herein IBM-owned operating systems are now dominant in the relevant market.

11.     Operating systems are written by software developers in computer code languages. A significant percentage of server operating systems are based on Unix programming paradigms and architectures, or related Linux programming paradigms and architectures (hereinafter, collectively "Unix/Linux operating systems").  Unix/Linux operating systems are reasonable substitutes and, if supported, can run on most servers made by the major manufacturers.

12.     Xinuos develops and sells operating systems called UnixWare and OpenServer. Xinuos operating systems are competitive in the marketplace and prior to the infringement of Xinuos' code, Xinuos' Unix based operating systems were the most widely used operating systems worldwide in the Unix/Linux server operating system market.  Xinuos' operating systems are

Unix-based server operating systems, with versions based both on Xinuos' proprietary Unix code as well as the "open source" Unix variant called "FreeBSD."

13.     Open source generally refers to software that anyone can inspect, modify, and enhance, and that is not controlled by a small handful of powerful companies.  FreeBSD, upon which Xinuos' OpenServer 10 product is based, is a free and open-source variant of the Unix operating system descended from the Berkeley Software Distribution ("BSD"), which was based on Research Unix.

14.     IBM sells the Unix-based server operating system called "AIX for Power," which as detailed herein copies Xinuos' proprietary software code to facilitate powerful features including the ability to compile and run Linux applications.  IBM also sells the z/OS mainframe, and i midrange server operating systems, both of which include implementations and/or runtime environments of the AIX operating system.

15.     Red Hat, and now IBM by virtue of their merger, sells a Linux-based operating system called "Red Hat Enterprise Linux" ("RHEL").

16.     "Linux" is a name for operating systems derived from the "Linux kernel," originally written by Linus Torvalds.  Pursuant to Torvalds's vision, like FreeBSD, Linux is also "open source."

17.     Xinuos has attempted to sustain, innovate, and compete in the area of Unix-based server operating systems, including building its own server operating system based on the open source FreeBSD project.  By contrast, as in many high technology industries, IBM has found it easier to acquire, or copy in the case of Xinuos, the technology of others (by any means available) and/or buy rivals than to compete.

18.     IBM's alignment with Red Hat, their abusive and illegal practices detailed herein,

and their formal merger threaten, as commentators have put it, to herald "the end of open source."

19.     Already Defendants have reneged on the promise of open source by jointly exerting undue corporate control over the direction of Linux development and attempting to destroy the competing FreeBSD open source project, have raised prices to supra-competitive levels, and have effectively shut down innovation in the Unix/Linux operating systems market.

20.     Xinuos and other rivals are now locked out of this market, even when their products are competitive and could be of substantial value to many customers.

21.     Xinuos brings this case to enforce the intellectual property and competition laws, to ensure a level playing field, and to protect consumer welfare.

## III.   THE PARTIES

22.     Xinuos is a corporation organized and existing under the laws of the U.S. Virgin Islands and having its principal place of business in St. Thomas, U.S. Virgin Islands.  Xinuos owns the copyrights asserted in this action.

23.     IBM is a corporation organized and existing under the laws of the State of New York and having its principal place of business in Armonk, New York.

24.     Red Hat is a corporation organized and existing under the laws of the State of Delaware and having its principal place of business in Raleigh, North Carolina.  Since late 2019, Red Hat has been a wholly owned subsidiary of IBM.

## IV.   JURISDICTION AND VENUE

25.     This Court has federal subject matter jurisdiction under at least 28 U.S.C. § 1331 (federal question), as this action arises under the Copyright Act, 17 U.S.C. § 101 *et seq*, and the federal antitrust laws, 15 U.S.C. § 1 *et seq*.

26.     The Court has supplemental subject matter jurisdiction of the U.S. Virgin Islands claims under 28 U.S.C. § 1367, as these claims form part of the same case or controversy as the

federal claim.

27.     This Court also has diversity jurisdiction under 28 U.S.C. § 1332, as there is complete diversity between Plaintiff and Defendants and the amount in controversy substantially exceeds $75,000.

28.     Venue is proper under at least 28 U.S.C. § 1400(a) because Defendants and/or their agents reside or may be found in the U.S. Virgin Islands.

29.     Venue is also proper under 28 U.S.C. §§ 1391(b).  A substantial part of the events or omissions giving rise to the claims occurred in the U.S. Virgin Islands, and a substantial part of property that is the subject of the action is situated in the U.S. Virgin Islands.  In addition, IBM and Red Hat are subject to personal jurisdiction in this district.

30.     IBM and Red Hat maintain property in the U.S. Virgin Islands, engage in conduct availing themselves of the privilege of conducting business in the U.S. Virgin Islands and engage in systematic and continuous contact with the U.S. Virgin Islands.

31.     IBM's and Red Hat's contacts with the U.S. Virgin Islands give rise to Xinuos' claims.  IBM and Red Hat utilize instrumentalities located in the U.S. Virgin Islands to carry out the acts alleged herein, have affirmatively directed actions underlying the claims herein at the U.S. Virgin Islands, have engaged in copyright infringement and anticompetitive and unfair business conduct in the U.S. Virgin Islands, and have caused injury to Xinuos and to competition in the U.S. Virgin Islands.  The exercise of personal jurisdiction over IBM and Red Hat is reasonable.

32.     For example, IBM has directed marketing of and/or has sold its AIX for Power, z/OS mainframe, and i midrange server operating systems and Red Hat has directed marketing of and/or sold its RHEL operating system, to U.S. Virgin Islands entities, including but not limited to multiple agencies of the U.S. Virgin Islands government, and commercial institutions.  IBM has

also directed marketing of and/or sold its z/OS mainframe operating system and the infringing "Unix System Services" environment and its i midrange operating system and the infringing "PASE" environment to the U.S. Virgin Islands.  All of these operating systems are at issue in the Complaint.

33.     Such use of infringing operating systems in the U.S. Virgin Islands includes AIX for Power.  IBM has directed and provided updates to AIX for Power customers in the U.S. Virgin Islands.  Use of AIX for Power in the U.S. Virgin Islands has included use of functionality enabled by the infringing code, including but not limited to the AIX for Power print subsystem.

34.     IBM also regularly directs its sales activities and sells other products into the U.S. Virgin Islands, for example the IBM Content Management System and Maximo systems.  IBM specifically identifies the U.S. Virgin Islands as a sales channel and directs its activities to that channel.  The government of the U.S. Virgin Islands has purchased in the past and has projected future purchases of, and support for, IBM products for all of the last three years.  IBM has also entered into an $18 million loan agreement with the government of the U.S. Virgin Islands.

35.     IBM and Red Hat have directed the unfair and anticompetitive business activities alleged herein at competing operating system provider, Xinuos, based in the U.S. Virgin Islands, and have therefore directed their activities underlying this complaint at the U.S. Virgin Islands.

## V.     RELEVANT MARKET

36.     The relevant market is the Unix/Linux paid server operating system market.  In this market, Red Hat offers RHEL and charges for annual subscriptions that include technical support, updates, security, and intellectual property protection.  IBM offers proprietary operating systems AIX, z/OS and IBM i, which are based on or which include Unix code, and for important functionality copies Xinuos' code.  Xinuos is also a competitor in this market, and offers the UnixWare 7, OpenServer 5, OpenServer 6, and OpenServer 10 operating systems.

37.     Customers that run corporate computer environments largely invest in a consistent operating system across the environment, as the decision involves associated investment in applications, middleware, hardware, and services.  Accordingly, enterprise customers deciding to switch to a new operating system family must make very significant investments in the new operating system and related software applications.

38.     This market is worldwide.  Paid server operating systems based on Unix and Linux paradigms and architectures are functionally the same from country to country, can be easily and inexpensively distributed around the world, and frequently are.

39.     Corporate users of Unix/Linux paid server operating systems, building and maintaining IT infrastructure, understand these paid server operating system products as reasonable potential substitutes for each other.  The technical and historical product similarities and the overlapping community of developers has created widespread industry recognition that Unix and Linux operating systems encompass a unique product market.

40.     Operating systems that are built on more dissimilar paradigms and architectures lack ready compatibility and are, thus, unlikely to be ready substitutes for Unix/Linux server operating systems.   The Unix and Linux architectural and programming paradigms are substantially similar such that developers and users in both environments can more efficiently address technical problems in either, and can more efficiently migrate applications written for one environment to another.

41.     Other operating system environments are so dissimilar that the migration of applications and update of operating system functions cannot occur seamlessly.  For this reason, most corporate users are much more willing to migrate between Unix/Linux operating systems and much less willing to expend the cost and time to migrate a Unix/Linux operating system

environment to other environments.  Finally, free server operating systems are also not adequate substitutes, as they are mainly used in testing, development efforts or minor applications, and not in production and, most importantly, lack the business-critical support and maintenance many corporate clients require and demand.

## VI.      FACTUAL BACKGROUND

### A.      Xinuos Develops and Sells Highly Valuable Server Operating Systems.

42.      Xinuos develops and licenses the UnixWare and OpenServer operating systems to business customers.  For example, a number of large enterprises, including retailers, technology services companies, banks and financial services firms, as well as small and medium sized businesses, have relied on Xinuos server operating systems for their corporate computing needs, such as inventory, human resources, billing and many other applications.

43.      Xinuos owns the code and has valid copyrights for the code behind UnixWare and OpenServer.  In particular, Xinuos owns the valuable copyrighted UnixWare-related code asserted in this matter, all created after September 19, 1995 ("the Code").  The Register of Copyrights has issued certificates of registration for the Code.  *See* Registration No. TX0005787679 (UnixWare 7.1.3); Registration No. TXu002214732 (Gemini 64); Registration No. TXu002214620 (Project Monterey).  These copyright registrations are attached to this Complaint at Exhibit A through C.

44.      At its peak, Xinuos' Unix-based operating systems were the most widely used operating systems worldwide in the Unix/Linux server operating system market.

45.      Xinuos' UnixWare 7 and OpenServer 5 and 6 operating systems were popular because they were stable, reliable, and easy to manage.  Unlike other operating systems, UnixWare and OpenServer could be efficiently deployed across thousands of hardware devices running at the same time without a concern for malfunction or failure.  As this ensured a well running computing environment for enterprise customers, UnixWare and OpenServer were not just highly popular,

but also understood by large enterprise customers, small and medium sized businesses and developers alike as highly valuable.

46.     UnixWare 7's success prompted an ambitious related project called Gemini 64 or Project Gemini, and a subsequent related project called Project Monterey.  The Code in these projects enables applications originally created for 32-bit processor architectures to continue to function and run on modern and higher-performing 64-bit processor architectures.  The Code also facilitates compatibility between operating systems in the Unix/Linux operating system market. An operating system with "cross-architecture" and "cross-compatibility" features is extremely valuable because it allows customers to use their existing applications even after migrating to the updated and more efficient hardware with 64-bit processors.  Such features save customers time and money and protect client bases from moving away to competitors.

47.     The Code was also designed to provide an array of modern enterprise-grade functionalities.  For example, the Code implements functionalities such as modern print systems, peripheral support, virtual filesystems, and debugging support, all of which enables much more sophisticated and complex application support for the enterprise.

48.     The Code was developed to enable highly scaled enterprise implementations and drive the buildout of a vast operating system ecosystem.

B.     **IBM Faces a Crisis and Pivots to a Service Centric Business Model.**

49.     At the time Xinuos' UnixWare and OpenServer products were at their peak, IBM was attempting to complete its transformation to a service-driven organization that also provided strategic outsourcing.  However, this transition was difficult because IBM derived most of its income from its highly-profitable proprietary high-end server hardware and its related software and services business.

50.     IBM's server operating systems were not growing in popularity or perceived as

11

valuable as other server operating systems in the Unix/Linux server operating system market. New Linux entrants to the market, particularly Red Hat, were beginning to attract attention and also constituted an emerging threat to IBM's operating system ecosystems.

51.     This was troublesome because one of IBM's main profit-drivers was at the time (and remains) its higher-end server hardware business. For example, analysts estimated that IBM's mainframes enjoyed gross margins in excess of 50%. On top of these initial margins, IBM had built the server ecosystems for several of world's largest companies and was able to continue to profit from those earlier sales through significant consulting, software sales, service support, and maintenance fees, which were estimated to often exceed the cost of the servers themselves. Moreover, these consulting, service, and maintenance revenues were mostly recurring in nature and their predictability was highly valued by IBM stakeholders.

52.     In the short term, IBM could confidently expect a consistent revenue stream from its server business. In the longer term, however, if IBM's server operating system products, which include not just AIX for Power, but also z/OS mainframe, and i midrange server operating systems, failed to improve, IBM's server business as a whole would be at risk.

53.     If IBM's operating system capabilities did not meet customers' needs and failed to provide necessary functionality for complex enterprise applications, customers would begin moving away from IBM's server ecosystem. They would instead turn to competing operating system and server hardware. IBM would lose the lucrative service and maintenance business, as well as sales of servers, operating systems and associated applications.

54.     IBM needed to quickly find a way to substantially improve its operating system technology.

### C.     **IBM Steals the Code.**

55.     Rather than innovating itself, IBM sought access to the Code. IBM and Xinuos'

predecessor agreed to engage in a joint venture that they called Project Monterey.  Project Monterey was designed to result in a completely new operating system product leveraging what was already under development for UnixWare 7:  an operating system for modern 64-bit hardware architectures that would allow applications originally created for 32-bit architectures to continue to function, and to include modern features for complex enterprise applications.

56.     Through Project Monterey, IBM gained confidential access to the Code.

57.     Project Monterey was then terminated by IBM without IBM gaining any rights to the Code under the applicable agreement.  Indeed, IBM specifically asked Xinuos' predecessor if it could use the Code in AIX, z/OS and IBM i, and the request was denied.

**D.      IBM Secretly Copies the Code into its Own Server Operating Systems.**

58.     Despite not having acquired any rights in the Code, IBM used the stolen Code, and incorporated it into core components of its AIX, z/OS mainframe, and i midrange server operating systems.

59.     The infringement made IBM's server software significantly more powerful and useful for enterprise customers.  In doing so, the infringement provided crucial protection for IBM's valuable high-end server business and enabled IBM to grow its own operating system ecosystem, server business and related services business.

60.     The stolen Code has been copied without permission into at least six different updates of AIX (AIX 5L 5.0, 5.1, 5.2, v.6.1, v.7.1, and v.7.2).  For example, an IBM report well after termination of Project Monterey confirmed that the Xinuos "code is now embedded within AIX."  The stolen Code has also been copied without permission into an AIX environment that runs within the z/OS mainframe operating system (called "Unix System Services").  And the stolen Code has been copied without permission into an AIX environment that runs within the i midrange operating system (called "PASE").  Indeed, on information and belief, few if any of IBM's server

operating system products do not incorporate the Code.

61.     The stolen Code has substantially improved IBM's server operating system functionality in at least seven important ways including but not limited to the following:

62.     The stolen Code enables 32-bit applications to run in 64-bit environments ("cross-architecture" functionality).  This is valuable to IBM and its customers because it allows existing enterprise customers to upgrade their hardware without having to pay for newly written applications.

63.     The stolen Code makes it possible for Linux applications to compile and run on and easily port to Unix operating systems ("cross-platform" functionality).  Most notably, the Code has made it possible to compile and run RHEL applications on AIX through what IBM has called "Linux Affinity" packages and Linux-related "Expansion Packs."  This functionality is valuable to IBM and its customers because it allows existing customers to use a larger variety of applications that potentially better fit their computing needs.

64.     The stolen Code allows for users to print documents (printing functionality).  IBM has admitted that its print subsystem code "was introduced into AIX as part of the Monterey project" and that its print subsystem code is based on the "UnixWare 7 print subsystem."  This functionality is valuable to IBM and its customers because printing is an essential requirement for any enterprise server customer.

65.     The stolen Code introduces multi-path input/out features into IBM's server software ("Multi-Path I/O" or "MPIO" functionality).  MPIO functionality is valuable to IBM and its customers because it supports complex enterprise applications by enhancing the ability of the operating system to communicate with connected devices, providing redundancy, failure detection capabilities and improved availability of those devices.

66.     The stolen Code makes it possible for the server operating system to support replacement of PCI devices and network boards without disrupting the operation of the server ("PCI Hotplug" functionality).  This functionality is valuable to IBM and its customers because it enables devices to be changed or upgraded, without interrupting the operation of applications running on the operating system.

67.     The stolen Code introduces an important monitoring analysis and debugging tool into the software called "truss" (truss functionality).  Truss makes it possible for users to trace all system calls made and signals received by a command on an existing process.  This functionality is valuable to IBM and its customers because it enables debugging application errors and determining how programs function, all critical functionalities for any customer deploying or developing applications on the operating system.  Moreover, truss functionality is essential if a user wants to develop a Linux-compatible environment.

68.     The stolen Code introduces innovations to the "/proc file system" into the IBM software (/proc functionality).  The /proc file system is an innovative "pseudo file system" that maps processes and kernel data structures to corresponding files.  This functionality is valuable to IBM and its customers because it enables easier access to and use of information about the system and running processes, which is critical for any customer deploying or developing applications on the operating system.

69.     IBM also copied Xinuos code that brought AIX implementations and runtime environments up to current Unix standards.  These examples of how the Code has been impermissibly copied into IBM's AIX, z/OS mainframe, and i midrange server operating systems are non-limiting and illustrative.  Indeed, the extent of known copying is so great that Xinuos believes the theft and copying is likely much greater, further penetrating essential operating system

15

functions.

70.     IBM's infringement has been profound and ongoing, and the infringing code is the technological basis for all the valuable server operating system features described above.  If the Code were removed, IBM's server software would have significantly reduced cross-architecture and cross-platform functionality, and it would not be able to support essential corporate computing needs.  In short, if the Code were removed, IBM's server software would be significantly less valuable; and for some enterprise customers, it would be completely useless.

71.     IBM has taken extraordinary steps to hide its infringement from Xinuos.  For years, IBM has fraudulently concealed its infringement from regulatory authorities, from industry analysts, experts, and influencers, and from public and private stakeholders.  IBM has misleadingly communicated through media and corporate statements that to the extent there used to be any doubt about Code ownership, that this doubt has been resolved and that Xinuos has no interest in the software.

72.     For example, IBM has made demonstrably and materially misleading statements in securities filings about its ownership interest in the Code.  In every annual report filed with the SEC since 2008, IBM has represented that a third-party owns all of the UNIX and UnixWare copyrights, and that this third-party has waived any infringement claim against IBM.  These self-serving representations are demonstrably false and misleading to investors and potential asset purchasers.

73.     Xinuos only became aware of the Code's theft and infringement in March 2019. At that time, Xinuos' management was engaged in a review of the company's intellectual property posture, and discovered certain IBM product documentation that revealed IBM had copied code.

**E.     IBM And Red Hat Align to Destroy Competitors, Dominate the Market, and Poison the Soil for Competition.**

16

74.     Once IBM upgraded its server operating system software with the stolen Code, IBM's valuable server hardware, related software, and services business became less vulnerable to competition.

75.     But not invulnerable.  Established and growing competitors in the Unix/Linux operating systems market remained and innovation continued, including by Xinuos and others. Most notably, Linux – and particularly Red Hat's version of Linux, RHEL – was gaining popularity and could still chip away at IBM's strong grip on high-end server clients.  Over time, RHEL would continue to pose a threat to IBM's server ecosystem and services business.  Similarly, Xinuos too continued to advance its Unix-based operating systems, posing a threat to IBM's server ecosystem and services business.  In particular, Xinuos' introduction of OpenServer 10, a 64-bit enterprise operating system based on the FreeBSD Unix open source architectures, posed a direct threat to IBM's market power.  Unless IBM were able to foreclose these rivals from competing for its server ecosystem and business customers, the risk that the customers would migrate over to the newer and more innovative technology options remained substantial.

76.     To protect its server hardware and services business from any threat, IBM needed more.

77.     Once again, rather than innovate, IBM chose to approach its greatest rival.

78.     As it had with Xinuos' predecessor when it was the leading operating system provider for Unix, IBM joined forces with arguably its greatest competitor, Red Hat.  This strategic alignment allowed IBM to penetrate and control every sector of the Unix/Linux operating systems market.  To capitalize on the alliance, IBM squeezed every advantage out of the infringing code that it could muster and shared those benefits with Red Hat.

79.     Thereafter, IBM and Red Hat worked together to dominate the market.  They

17

divided the market for enterprise clients to protect IBM's precious high-end server, software, and services business, they promoted each other's operating system products, and they granted each other special technical access and abilities that were not made generally available and from which Xinuos and others were specifically excluded.  These bad acts continue to this day.

80.     Finally, after reaching the top of the market, IBM and Red Hat have abused their seat of power to poison the competitive soil.  They have both exploited their market control and manipulated the public narrative to deter, forestall, and outright exclude potential competitor entry.

81.     IBM's plan worked – to its own benefit and billions in profits, and to the detriment of market competition and consumers.

82.     IBM's theft and infringement of the Code has been central to IBM's ability to carry out these abusive and anticompetitive business practices.

### 1.     IBM and Red Hat Make A Mutually Beneficial Illicit Agreement

83.     When Xinuos' UnixWare and OpenServer products were the market-leading operating systems, Linux-based software packages were only just building credibility amongst business customers.  Skepticism that had deterred the largest enterprise customers with very complex and sophisticated corporate computing needs ("high-end" customers) from adopting Linux were starting to erode.  Small- and medium-sized companies with simpler corporate computing needs ("low-end" customers) in particular were becoming open to Linux.

84.     IBM did not treat Linux and Red Hat like any other competitor.  Instead, IBM used Red Hat as a means to further protect its high-end customers and build market power.

85.     Red Hat and IBM agreed that Red Hat would take control of the low-end of the Linux and Unix server operating system market.  IBM effectively gave up customers to Red Hat so that it could have visibility into and control over Red Hat's growth, so it could gain access to low-end customers as their computing needs became more complex and financially attractive, and

so it could continue offering its customers a full range of server products and would remain a fabled "one-stop shop" for corporate customers and a more attractive outsourcing partner. This arrangement excluded other rivals from accessing the low-end of the market. With more control over competition and competitors in this space, IBM was able to simultaneously ensure that it kept its highest-value customers and exclude rivals from accessing its most profitable market. Red Hat was IBM's co-conspirator and alter-ego, steered by the larger company to ensure that any Red Hat success would benefit IBM as well.

86. Red Hat also helped IBM extend its influence over the development of Linux. Red Hat has deep ties to the developers that work on the Linux "kernel," which is the core set of Linux source code. By penetrating Red Hat and this exclusive developer's community, IBM dictated important technical standards and development decisions that would impact Linux moving forward, making sure that any changes were compatible with and benefited IBM technology.

87. IBM, for its part, provided Red Hat with the sheen of credibility that comes from one of the oldest and largest technology companies on the planet. This sheen was necessary given IBM's plan to provide Red Hat with access to certain of its customers and integrate Red Hat technology into its own software. Perversely, IBM was only able to offer Red Hat these benefits because of the cross-platform functionality and other enterprise-grade functionality that it gained from infringing Xinuos' source code.

88. Ultimately, IBM and Red Hat – natural competitors in the market for Unix and Linux operating systems – aligned to perpetuate this illegal plot, and while their rapacious objective benefited IBM and Red Hat, they also caused severe harm to the market, the industry, the open source and development community and, finally, customers. In summary, in light of the illegal plot, competitors in the market are both locked out from competing for high-end customers

19

and are also forced to compete at a disadvantage for low-end customers.  As a direct consequence, high-end enterprise customers, and low-end customers, alike, are denied genuine opportunities to consider alternate and potentially more suitable products and are forced to pay supra-competitive prices for the products available.

### 2.    IBM And Red Hat Destroy Competition and Dominate the Market

89.    IBM and Red Hat successfully worked together to dominate and ultimately rise to the top of the Unix/Linux operating system market.  The many unfair and anticompetitive business acts taken as part of this effort include, but are not limited to, dividing the market for their mutual benefit, promoting each other's products to the detriment of others, granting each other special technical access and capabilities not otherwise available, and jointly taking specific technical steps to exclude Xinuos.

### a.    Dividing the Market

90.    IBM and Red Hat agreed to divide the market so that IBM could reap hardware sales, software sales, consulting fees, outsourcing revenue, and maintenance and service fees from the high-end server customers and Red Hat could reap software sales, consulting, and maintenance and service fees from the low-end server customers.  To do this, the companies established a "multiyear alliance" where they would "package each other's consulting and service[s]" and target particular clients based on their location in the market.

91.    The terms of this agreement included joint marketing and "shar[ing] leads and jointly approach[ing] customers."  Thus, rather than competing based on their respective operating systems and associated services capabilities, IBM seemingly undertook to act contrary to its interests by giving Red Hat more access to its clients than would otherwise be the case, when in fact it did so in order to maintain control over the highest-end enterprise customers who used IBM's operating systems.  In return, Red Hat "support[ed] many of IBM's Linux efforts,"

according to one observer.  Red Hat characterized their agreement with IBM as follows: "With IBM, we're getting more and more engaged with them as a partner in some large accounts…"

92.     The purpose and effect of the illegal agreement between IBM and Red Hat was an understanding that each company would refrain from competing with the other for the same customers.  It was observed that "[b]efore the new contract, Red Hat was only getting whatever dropped off [IBM] Global Services' table, reportedly some work that went for an unattractive $300 an hour."  After the agreement, IBM Global Services drove its low-end clients to RHEL and Red Hat's services.  At the same time, IBM drove its most valuable and largest enterprise clients to its own operating systems and services.

93.     Under this agreement, IBM gave preferential support to RHEL installed on IBM servers, as compared to competing operating systems even in contexts where RHEL supplanted IBM's own operating systems.  Red Hat's vice president of marketing was overt about the anticompetitive effects of these steps.  He discussed how, before the agreement, both IBM and Red Hat were competing for lucrative service revenues based on their respective operating systems: "We've been working with [IBM] to some degree already … But we've also been competing with them all the time in terms of their global services division – their intention was always to own the customer relationship."  However, *after* the agreement, they each reserved to themselves sales and services revenues in different segments of the market.  As one observer put it, this agreement between IBM and Red Hat "would kinda take care of the competition" in terms of excluding competing Linux and Unix operating systems.

94.     Under this alliance, the companies did not compete against one another for business customers in their separate segments of the market.  Instead, to the extent that Red Hat and IBM did interact in the market, it was to promote and benefit each other to the detriment of all others.

95.     For example, while IBM continued to support its server operating system products, to the extent that any of its server customers sought to move away from IBM operating systems, IBM drove them toward Red Hat.  IBM offered rebates as high as $10,000 to customers that bought IBM servers packaged with RHEL, but refused to offer similar rebates to customers buying servers with other major competing operating systems in the Unix/Linux server operating system market. Those servers would typically have come with IBM's competing AIX operating system installed. Yet, IBM was *paying* customers to purchase the competing RHEL.

96.     Similarly, IBM reimbursed server business partners as much as $3,000 per person to get certified to use Linux through Red Hat, and provided courses on RHEL applications.  These acts not only pushed customers towards Red Hat but also made it impossible for rivals like Xinuos to compete.  By agreeing with Red Hat that RHEL would replace IBM's operating systems at customers who would otherwise have considered competing operating systems and would have considered different server hardware that did not even run IBM's operating systems, Red Hat and IBM divided the market and excluded Xinuos and other competitors.  By excluding competing operating systems from the IBM server ecosystem and, further, by jointly preventing customers from moving to other server ecosystems, Xinuos was denied substantial benefits.

### b.     Unfair Preferential Treatment

97.     Even more telling, IBM agreed to make its servers compatible with RHEL, and ultimately made RHEL the default operating system across certain of its family of server products, which would otherwise use IBM's own AIX operating system.  Thereafter, Red Hat indicated that "it has expanded its agreement with IBM" in a manner that allowed RHEL "to be ordered concurrent with" orders of IBM's Power hardware, as well as support options.  Red Hat indicated at that time that the effect of this agreement was one that "no competing enterprise platform can match."

22

98.     RHEL was the first and exclusive competing operating system to be installed on IBM's servers using its Power processors in lieu of its own AIX operating system and to the exclusion of competitors who would otherwise be competing to migrate customers away from IBM's server and operating system environments. This protected IBM's server business in the same way that leveraging Xinuos' code to achieve cross-platform functionality protected IBM: it allowed customers to remain on IBM hardware while using the Linux operating system.

99.     IBM further supported Red Hat by extending RHEL capabilities on mainframes and midrange servers in order to ensure that customers would not migrate from IBM's mainframes and midrange servers.  For example, over time large enterprises began moving applications to IBM mainframes and midrange servers running RHEL, from competing operating systems and servers. RHEL applications did not run natively on mainframes and midrange servers, but rather had to be recompiled.

100.     IBM in fact paid Red Hat to port its code to the mainframe.  IBM and Red Hat installed RHEL on IBM's mainframes, instead of the native IBM mainframe operating system, z/OS, to exclude competitors offering competing Linux or Unix server operating systems that would otherwise draw customers away from IBM's server ecosystems.

101.     For example, Red Hat has admitted that it pushed and committed significant resources with IBM to ensure that competing Linux distributions were at a disadvantage in this context.  This is just one of the several anticompetitive acts that Red Hat has taken alongside IBM.

102.     IBM also agreed with Red Hat to enable RHEL installations in larger enterprise data centers, instead of IBM's own AIX for Power, z/OS mainframe, or i midrange server operating systems.

103.     Moreover, when IBM entered the cloud market, it gave preferential treatment to

RHEL and associated Red Hat virtualization technology over its own and competing technologies. Indeed, IBM entered into an agreement with Red Hat so that RHEL would be the "default choice for the operating system" in IBM's hybrid cloud, and "to use Red Hat software as the foundation for its new cloud computing service," instead of its own operating systems.  In the years that followed, IBM extended its "long-standing alliance" with Red Hat by promoting RHEL instead of its own operating systems in the "hybrid cloud … spanning platform infrastructure located both on and off premises."  The purpose of the agreement was to disadvantage competing operating systems, such as Xinuos' OpenServer 10, which could otherwise compete in all of the on-premises, data center and cloud environments.

### c.      Impact of the Anticompetitive Acts on the Market

104.    The substance of the original agreement and the extensions, including to divide the market and customers, over the course of years can be seen from its effects.

105.    While the number of installations of AIX has continually decreased, in recent years, AIX was running in 10 out of the world's top 10 banks, 10 out of the world's top 10 telecommunications companies, 8 out of the top 10 retailers and 8 out of the top 10 insurers.  In this way, AIX is dominant in the high end of the market, as it does not face competition from RHEL in those contexts.

106.    Accentuating the goal to hold onto the top of the market with AIX, an IBM representative stated "(An AIX user) asked me, 'Do you think that AIX is dead for the future? There are fewer and fewer proposals from recruiters.'  I answered with: That is a truly bizarre conclusion to come to on that evidence. AIX is a multibillion-dollar business for IBM. Why would IBM stop that revenue? That would be bonkers!  AIX is running in the vast bulk of major companies in the world, and AIX is running their most vital workloads. IBM and AIX are here for the long term."

107.    Similarly, while the number of installations of the z/OS operating system on mainframes has continually decreased, in recent years, 71% of all Fortune 500 companies had their core business on it, and it was running on 23 out of the top 25 retailers, 92% of the top 100 banks, 10 out of the top 10 insurers, 225 state and local governments, and 9 out of the top 10 global life and health insurance providers.  As one observer put it "IBM's mainframe strategy comprised focusing upon a relatively small number of large customers with whom IBM established long-term relationships, high prices, high levels of technical support and vertical integration."  In this way, z/OS is dominant in the high end of the market, as it does not face competition from RHEL in those contexts.

108.    Over that same period, installations of RHEL grew.  More than 70% of Linux installations in the market now use RHEL.  Part of this exploding market share resulted from IBM's services division pushing the competing RHEL operating system in the low end of the market, as a preferred "option for SMBs" (small and medium sized businesses).  To illustrate, over the course of the agreement and its extensions, IBM pushed RHEL "into small and medium-size businesses" as "the opportunity we have to go after," particularly as the evolution from on-premises to IBM's hybrid cloud model has evolved.

109.    Instead of competing with RHEL, IBM allowed RHEL into its "small-medium" enterprise accounts, in order to achieve scale in both on-premises and cloud contexts.  As Red Hat put it, the agreement and its extensions were to enable IBM and Red Hat to jointly "capture small and medium enterprise customers," who might have otherwise moved to competing operating systems, including competing Unix operating systems like the products of Xinuos or other forms of Linux.

110.    Notwithstanding that IBM's server operating systems and RHEL would otherwise

be competitive products, IBM intentionally supported RHEL over its own operating systems in some customer accounts.  For example, as an IBM executive put it, when asked whether IBM's eventual goal is to replace AIX with RHEL, he responded, "It's fairly obvious we're fine with that idea ... It's the logical successor."  Such positions against IBM's own interest indicate the presence of the anticompetitive agreement to divide the market and customers, as such a position would make no sense unless IBM and Red Hat had an arrangement to allocate markets and customers, and IBM was supporting competitor Red Hat as a means to prevent growth and entry of other competing operating systems.

111.    At the same time, IBM's actions with respect to non-RHEL competitors reveals that IBM was keeping its highest-margin, largest enterprise customers on IBM's own AIX, mainframe and midrange server operating systems, and was using RHEL as a means to prevent any other non-RHEL competitors from supplanting IBM.  For example, one non-RHEL operating system competitor of IBM observed that

> [o]nce or twice a month I'm seeing this. In an IBM account with lots of AIX, they do everything they can to protect their proprietary stuff. … IBM is fighting tooth and nail to keep that company on AIX … We're talking to them about moving to Linux, and IBM is going out of its way to demonstrate why Linux is not ready for their environment. It's really twisted. IBM is doing all this marketing around Linux, and here I am competing against IBM using Linux, and IBM is using AIX.

112.    Similarly, IBM itself admitted that, putting Red Hat aside, its goal with respect to Linux generally "is not to convert its existing AIX customers to Linux." In other words, in general, IBM was attempting to keep customers from leaving its AIX operating system and moving to competing Linux operating systems. This demonstrates that IBM and Red Hat would have otherwise been competitors for such accounts. However, contrary to the normal and expected competition between IBM's AIX operating system and Linux operating systems, IBM supported RHEL over its own AIX and steered low-end customers to RHEL. This further demonstrates that

26

IBM threw its support behind RHEL in the low-end of IBM's customer markets as a mechanism to prevent the growth and entry of other competing operating systems.

113.    At the same time that IBM was attempting to keep customers on AIX, to the extent the customer was moving to Linux, IBM facilitated, through its services arm, transition to competitor RHEL over which it had control and could extract anti-competitive benefits.  Red Hat recognized that it was competing for Unix installations.  A Red Hat executive observed regarding the "installed base" of "UNIX servers" that "those platforms create a great opportunity for Red Hat Enterprise Linux to continue to serve those workloads.  But at the same time, with our partnerships with IBM we can offer mainframe solutions, or even on the [P]ower architecture."  IBM's and Red Hat's anticompetitive agreement facilitated migration to RHEL.

114.    The original agreement and its extensions prevented competition from Xinuos' or other operating systems in those environments while also preventing the entry and growth of new operating systems, such as Xinuos' OpenServer 10, which could be run in on-premises or cloud environments.

115.    The original agreement and its extensions gave IBM and Red Hat an unfair advantage in the market, and further benefited Red Hat by ensuring that in some of IBM's enterprise customers, RHEL would be installed as a matter of course, instead of providing genuine competitive opportunities for Xinuos and other competing operating systems providers.

116.    Through IBM's original agreement and extensions with Red Hat, IBM divided the market by retaining certain high-end AIX, mainframe and midrange server operating system customers, that might otherwise depart IBM's ecosystem, and charged higher prices for those particular deployments.

117.    Thus, based on all of the foregoing, and further material set forth below, IBM and

Red Hat have maintained an illegal agreement to jointly maintain and leverage control over RHEL, divide the server operating system market and customers, lock in customers and restrain competition in the relevant market. Xinuos has reason to believe this agreement was entered into and enforced by senior executives of both companies.

### d. Negative Impact on the Open Source Community and Competitors

118. These arrangements also raised Red Hat's profile to the detriment of other Linux and open source operating system options, such as FreeBSD. Indeed, over the period that IBM has been unfairly pushing RHEL, there has been a corresponding decline in support for FreeBSD, a competitive, equally-featured open source Unix architecture upon which Xinuos' OpenServer 10 product is based.

119. These practices facilitated the widespread migration to RHEL and enabled, as one Red Hat executive put it, a "shift of the million-plus servers that are in the installed [Unix] base today over to Red Hat Enterprise Linux." Absent the agreement between IBM and Red Hat, these migrations would have represented a lucrative market opportunity. However, because of the illegal agreement between these two natural competitors, other market competitors such as Xinuos were never afforded the chance to compete. IBM and Red Hat's conduct stifled market growth and innovation.

120. For Red Hat's part, a majority of contributions developed and delivered by IBM have been accepted into RHEL, and IBM's contributions to the Linux kernel have been prioritized. One observer noted that "Linux is increasingly developed by a small pool of corporate-sponsored developers," particularly "programmers hired by companies such as IBM Corp. [and] Red Hat Inc." IBM and Red Hat have become "the world's two largest commercial Linux developers," and they have turned that power in their own favor. IBM has "some 600 engineers in 40 locations"

working "with Red Hat's Engineering team" to advance their technical goals in the development of RHEL, when they would otherwise be competing.  The companies have jointly leveraged these developments and technical advantages against competitors.

121.    Similarly, IBM and Red Hat excluded competitors from application development opportunities and benefits.  Defendants supported interoperable C/C++ tools in Linux and an AIX port of Red Hat's Package Manager (RPM).  Red Hat also agreed with IBM to adapt its RHEL software for IBM systems, in a manner that other competitors could not achieve.

122.    IBM also agreed with Red Hat to engage in joint development of RHEL and associated applications, all of which had the effect of providing scale to RHEL that would not have otherwise been possible, while dissuading application developers, hardware manufacturers and partners from supporting competing operating systems of Xinuos and others.  This agreement between IBM and Red Hat also had the effect of increasing switching costs to move away from IBM's and Red Hat's joint ecosystem to competing operating systems, which were not afforded such advantages.

123.    At the same time IBM and Red Hat were taking steps to entrench their market dominance, they were also taking steps to exclude Xinuos.  Xinuos was not afforded the technical advantages or opportunities that were provided to Red Hat.  Xinuos was not invited to integrate its operating systems with IBM servers in any manner.  For example, IBM and Red Hat jointly introduced a set of upgrade services to help clients migrate to Red Hat Enterprise Linux.  Xinuos and other competitors in the Unix/Linux market were excluded from this preferential treatment.

124.    IBM took specific steps to affirmatively target Xinuos and its operating systems. For example, IBM dropped support for Xinuos' operating systems with respect to the IBM Informix database product while IBM continued to provide such support for Red Hat.   Thus,

Xinuos customers who needed to maintain their corporate applications that relied on this database product were unable to do so, as they were denied access to new versions of the product. This had the effect of causing customers to leave Xinuos' operating systems and to move to RHEL.

125.    Similarly, and most recently, IBM and Red Hat took particular steps to exclude Xinuos specifically in the context of cloud computing. As IBM's server ecosystems have evolved from on premises deployments to cloud-based deployments (*i.e.* the "IBM Cloud"), Red Hat has compounded the advantages of its anticompetitive agreement with IBM. In particular, IBM and Red Hat agreed that Red Hat's virtualization technology would be used as the "foundation" of IBM Cloud. This technology is designed to allow operating systems to run in virtual machines on servers. However, at the same time, IBM and Red Hat have constructed the IBM Cloud such that Xinuos' OpenServer 10 based on open source FreeBSD Unix is substantially excluded from working as efficiently or effectively.

126.    Moreover, IBM and Red Hat have targeted Xinuos' OpenServer 10 by specifically and systematically disparaging and agreeing to exclude FreeBSD-based Unix operating systems from the IBM Cloud. For example, IBM and Red Hat have ensured that FreeBSD and FreeBSD-based operating systems such as OpenServer 10 are not supported operating systems in IBM Cloud. Instead, IBM and Red Hat agreed to make RHEL the "default choice for the operating system" in the IBM Cloud. Conversely, FreeBSD is explicitly given less support as a guest operating system in the virtualization technology that Red Hat and IBM agreed to deploy in IBM's cloud.

127.    These steps have harmed Xinuos and consumers as there is demand for an alternative such as Xinuos' OpenServer 10, based on FreeBSD, in the IBM Cloud server environment. Indeed, users ask "Why freebsd is not supported in the IBM Cloud?". The answer

to this question is simple:  IBM and Red Hat are working together to exclude FreeBSD, upon which OpenServer 10 is based.  This is particularly damaging to Xinuos since OpenServer 10 is the only paid server operating system based upon FreeBSD in the Unix/Linux server operating system market.

128.    IBM and Red Hat even made a joint presentation revealing their arrangement to destroy OpenServer 10's FreeBSD open source project:



129.    IBM and Red Hat jointly and publicly conveyed to the market that they were destroying OpenServer 10's base, FreeBSD, and in particular destroying FreeBSD in the IBM hybrid and private cloud context.  This was designed to exclude and impede competition from FreeBSD-based operating systems, particularly OpenServer 10—the primary competitor in this context, and the only off-the-shelf FreeBSD-based operating system on the market.

130.    IBM and Red Had explicitly understood what they were doing, *i.e.* working together to use RHEL to supplant OpenServer 10's base, the FreeBSD project.  For example,

IBM's president and former CEO of Red Hat observed: "And one of the dynamics you'll see in open source, which is different than in traditional software, is it really is winner-take-all. There are other open source alternative operating systems like FreeBSD or other container management platforms, but you typically have one platform that ends up being 90-plus percent of usage and 90-plus percent of contribution." The series of illegal agreements entered into by IBM and Red Hat usurped the ordinary competitive dynamics, by which they would have otherwise been competing for position in this market context. Instead, they jointly and anticompetitively hastened the "winner take all" dynamics and to the joint and intentional exclusion of competitors.

131. IBM and Red Hat have been able to extract extraordinary rents from the software and services that they have unfairly obtained through their collusion to favor RHEL to the exclusion of other competing operating systems. For example, IBM and Red Hat have indicated (as reflected below) that for each dollar spent on the platform itself (i.e. RHEL or virtualization capabilities), many multiples in revenue are derived. Similar benefits are not afforded to competing operating systems such as OpenServer 10.



132. There is no legitimate, procompetitive reason to exclude OpenServer 10's base FreeBSD. The whole point of virtualization in cloud server environments is to afford greater

flexibility in operating system deployment.  And OpenServer 10 would bring many consumers great value and utility, as a 64-bit operating system built upon FreeBSD, supporting up to 64 CPUs, 4TB of RAM, thousands of users, legacy Xinuos products (such as legacy UnixWare and OpenServer) in a virtualized environment, an advanced development service and file system support, advanced security features, Linux emulation (*i.e.*, cross-platform capabilities), and the ability to deploy in the cloud.  Consumers are denied the benefits of FreeBSD, including its high level of stability, reliability and security, its superior network performance, excellent I/O and memory management, its ease of upgrade and maintenance, and its compact kernel architecture.

133.    Further, the FreeBSD open source licensing regime provides customers with substantial flexibility in deploying, modifying and using the operating system code as compared to Linux and its associated licensing regime.

134.    Given all of these significant, commercially valuable features, OpenServer 10 would have brought great consumer benefits.  Yet, here, Xinuos and its FreeBSD-based product are being specifically targeted to prevent introduction into that ecosystem.

135.    All of the foregoing conduct targeting Xinuos' operating systems and excluding them from the market, through IBM's and Red Hat's joint action, has caused application developers, hardware manufacturers, and partners who would otherwise support Xinuos, to instead believe that there is no reason to invest in supporting Xinuos' operating systems, including particularly OpenServer 10.

136.    The result of IBM and Red Hat's concerted efforts has been market dominance. With IBM's help, installations of Red Hat have grown to more than well above 60% of the Unix/Linux paid server operating system market.  And IBM's grip on the high-end server and mainframe segment of the market, as described above, is as strong as ever.  These are valuable

market opportunities that IBM and Red Hat foreclosed from competitors through their alliance to divide and control the market.

137.    As a result of their anticompetitive agreement and actions, IBM and Red Hat jointly control over 64% of the Unix/Linux server market and that market power is growing every day. IBM and Red Hat control the most lucrative licenses in the market and have foreclosed access on any competitors gaining a foothold on valuable licenses moving forward.  The result of their unfair business practices has not just been their ascendance and the unnecessary decline of legitimate rivals, but also a decline in innovation and technical development due to the lack of actual competitive market pressure.

### 3.    IBM And Red Hat Abuse Their Seat of Market Power

#### a.    Harm to Market Competition

138.    As a result of these activities, Xinuos has been excluded from key opportunities in the market.  For example, despite Xinuos offering a FreeBSD-based operating system with substantial commercial value for enterprise users, Xinuos was unable to garner as much financial support or customer interest in OpenServer 10 as it could and should have due to the market conditions.  Indeed, the market is so distorted that Xinuos has determined that over 70% fewer of its customers are in a position to license its new operating system than would be available in a functioning market.  The foreclosing effect on Xinuos is felt by all competitors as well.

139.    In addition to unfairly gaining market power, after rising to the top, IBM and Red Hat have abused nascent competitors and have manipulated the public.  This has allowed the companies to preserve their market control despite failing to develop and offer the best products.

140.    The illicit IBM-Red Hat agreement provided the companies with extraordinary scale and access in the Unix/Linux operating system ecosystem.  With control over both the high-end customer base and low-end customer base, and with their mutually-benefitting agreements

forcing rivals to compete at a disadvantage, it has become all but impossible for other firms to penetrate any sector of the Unix/Linux paid server operating system market.

141.    This is reinforced by two factors.  Once an enterprise customer is locked into a server and accompanying operating system, it is difficult for the company to migrate to new products.  The difficulty is both practical – migrating an entire business from one hardware and software package to another requires time, cost, and is not without risk – and technological, as there is a concern that necessary applications will no longer function.  For IBM and Red Hat, this means that their business customers are unlikely to depart unless a competing product had substantial support from the application developer and operating system partner communities.

142.    But here as well, IBM and Red Hat are at an advantage.  Seeing that IBM and Red Hat have a controlling share of the market, application developers, hardware manufacturers and partners in the Unix and Linux community are disproportionately willing to work on operating system products created by those two companies.   Application developers, hardware manufacturers and partners have strong economic incentives to focus on projects for operating systems that have achieved enough scale.  By contrast, those same parties are deterred from supporting projects for operating systems other than market leaders IBM and Red Hat, and simply will not support projects for Xinuos' operating systems as a result.

143.    Software development is characterized by substantial economies of scale.  The fixed costs of producing applications are very high.  The costs of developing software are "sunk" once they have been committed, and such resources cannot be used for another purpose.  Due to these effects, and the high cost of porting applications to multiple systems, application developers generally write first for operating systems with the greatest scale and network effects.

144.    For example, after IBM and Red Hat ceased competing with each other and

allocated their respective submarkets, application developers invested in developing and updating applications for RHEL and AIX, thereby disincentivizing developers to continue developing for UnixWare and OpenServer, including particularly OpenServer 10's FreeBSD base.  Similarly, due to the effects of the agreement, hardware manufacturers invested in developing and updating drivers for RHEL and AIX, but no longer for UnixWare and OpenServer.  These unfair market advantages only exist because of the anticompetitive agreements between IBM and Red Hat.  The financial windfall and market power that IBM and Red Hat steadily built has grown out of these benefits.

145.   This, in turn, creates practically unscalable barriers which squeeze existing participants like Xinuos out of the market and create barriers to entry that prevent Xinuos and other potential entrants from introducing new products into the relevant market.  These barriers make it impossible for rivals to entice customers away from IBM and Red Hat, even when IBM and Red Hat priced their operating systems substantially above competitive levels for a significant period of time.

146.   The agreement to divide the market between IBM and Red Hat and exclude competitors has created conditions where it is prohibitively expensive for Xinuos and other competitors to develop similar scale and network effects such that the ecosystems around UnixWare and OpenServer can have a large and varied enough base of compatible applications and hardware support to compete against RHEL and AIX.  Under these conditions, IBM and Red Hat are able to jointly perform additional anticompetitive acts that would have otherwise not been possible.  Indeed, as already described above, these conditions contributed to foreclosing Xinuos from financial support, development support, or customer interest in OpenServer 10, despite the valuable commercial benefits that OpenServer 10 offers.

36

147.    Xinuos and other competitors in the server operating system market face significant barriers to entry given the joint dominance of IBM and Red Hat resulting from their agreement to divide the market and exclude competitors.  Xinuos and other competitors also face significant barriers to entry in that market given the scale of applications and functionality specifically designed to operate on Red Hat and IBM server operating systems.

148.    In fact, IBM's code theft, in service of IBM's and Red Hat's coordinated action, was specifically directed at creating and scaling cross-platform and cross-architecture availability of such applications, which has led to these substantial barriers to entry and also the conditions for successfully performing additional anticompetitive acts.  Not only has the code theft increased the barriers to entry for others, but at the same time has decreased IBM's own cost of transition to access client from other operating systems and has allowed IBM to shift their own customers along their product portfolio (for example from AIX for Power, to midrange operating systems, to mainframe operating systems).

149.    Xinuos and other competitors face significant barriers to entry due to economies of scale over the continuing period in which IBM and Red Hat have been able to, through an anticompetitive agreement, dominate enterprise customer, applications and developer ecosystems to the exclusion of competitors, such as Xinuos.  Xinuos and other competitors cannot overcome these barriers, due to the time and expense required to sufficiently develop scaled ecosystems. Xinuos cannot obtain the support to equal such scale due to the anticompetitive agreement. Further, once committed to IBM's and Red Hat's ecosystems, the switching cost for enterprise customers and developers precludes Xinuos and other competitors from competing for those customers and developers.  For all of these reasons, barriers to entry for Xinuos and others are very high.

b.      **Harm to Market Customers**

37

150.    Through their agreement, IBM and Red Hat were also able to lock-in customers who would otherwise move to Xinuos' UnixWare and OpenServer operating systems and away from either IBM's AIX for Power and z/OS mainframe and i midrange server operating systems or Red Hat's RHEL operating system.

151.    With respect to high-end customers using IBM's operating systems, there were significant costs associated with migrating away from them.  IBM kept these companies in place and paying supra-competitive prices by preventing any other competing operating system from gaining the scale of RHEL and its concomitant application ecosystem, and at the same time providing preferential treatment for RHEL applications to run on the mainframe and midrange servers.  This lock-in also enabled capture of these companies who had no choice but to pay IBM for high-end services supporting IBM's operating systems.   With the advent of cloud environments, these high-end customers would have otherwise migrated away from legacy IBM operating systems to cloud-enabled operating systems such as OpenServer 10, but IBM's joint action with Red Hat caused them to invest even further into existing IBM operating systems, thus deterring transition to better products.

152.    With respect to low-end customers using RHEL, these customers faced lock-in simply from the inordinate scale that IBM and Red Hat has achieved through their joint arrangement, leading to an application and hardware environment that, in turn, causes customers to invest even further in RHEL.  Such RHEL customers would have otherwise moved away from RHEL to the competing OpenServer 10, which runs across on-premises, data center and cloud environments alike, has similar virtualization features and an open source base.  However, beyond the investment in RHEL itself, these customers have become locked in through investments in applications and hardware, thus deterring transition away from RHEL.

153.   Through their agreement, IBM and Red Hat were able to exclude Xinuos, with competitive products, as well as other competitors. IBM's and Red Hat's agreement allowed them to unfairly and illegally "deeply penetrat[e] the mission-critical infrastructures of many of the world's Fortune 500 companies"—once the providence of Xinuos—and divide those customers between them. The anticompetitive acts deformed the otherwise competitive market so that enterprise customers were substantially more likely to choose either IBM or Red Hat for their operating system needs.

### c.   The Present Conditions

154.   Through, at least, the foregoing agreements and acts, IBM and Red Hat have unlawfully divided the market, excluded competitors, reduced competition, and restrained trade by engaging in an unfair campaign to suppress the competing operating system ecosystems of Xinuos, to coerce customers to stop dealing with Xinuos and to move away from Xinuos' operating systems, and to prevent Xinuos from competing for customers of IBM and Red Hat which would otherwise move away from Defendants and to Xinuos operating systems.  Other competitors in the Unix/Linux market face similar challenges due to IBM and Red Hat's anticompetitive conduct. The anticompetitive agreements and acts between IBM and Red Hat have had, as their central purpose, the handicapping of Xinuos and similarly situated competitors in the marketplace.

155.   In these ways, IBM and Red Hat have avoided competition on the merits and have deprived Xinuos and similarly situated competitors of the opportunity to stake their prices and quality against IBM's and Red Hat's for every potential server operating system sale.

156.   IBM's and Red Hat's anticompetitive market allocation has severely impaired Xinuos' ability to build and expand its operating system ecosystem, retain customers and compete for customers using IBM's and Red Hat's server operating systems.

157.   IBM's and Red Hat's market allocation agreements and ongoing anticompetitive

conduct have unfairly and artificially capped Xinuos' market share, and have constrained Xinuos from expanding to reach the minimum efficient levels of scale necessary to compete with IBM and Red Hat.  By refusing to compete with each other and instead dividing the market for operating systems favored by large corporate users, IBM and Red Hat were able to jointly leverage control over foundations of enterprise-information technology.  As one technology analyst put it, from IBM's perspective Red Hat was "valuable both to own and to keep out of your competitors' control," and that controlling Red Hat provided "soft power," i.e. the ability to have undue influence over Linux and to capture the primary threat to which existing customers would migrate to.  As a result, customers continue to buy most of their server operating system requirements from IBM and Red Hat, continue to pay supra-competitive prices, and continue to be exposed to IBM's and Red Hat's economic coercion and lock-in.  With Xinuos' opportunity to compete thus constrained, the cycle continues, and IBM's and Red Hat's supra-competitive profits continue to flow and consumer choice is reduced.

158.    These naturally reinforcing factors tightened IBM and Red Hat's grip on the market and poisoned the soil for competitive growth.  Without aid from the developer, hardware manufacturer, and partner communities, and without access to clients, it is significantly more difficult for competing operating system providers such as Xinuos to grow their business and avail themselves of opportunities that would have been available in a properly functioning market.

159.    This has caused damage to Xinuos specifically.  Xinuos' new OpenServer 10 operating system is built upon the very high-quality and highly regarded Unix open-source format, FreeBSD, and provides high-powered functionality to business customers.  However, notwithstanding these facts, Xinuos has not been able to build traction for OpenServer 10 with developers, partners, or corporate customers.  In a well-functioning market, OpenServer 10 would

have built interest and enabled conversion of Xinuos' preexisting customer base which would have a more straightforward, less costly, and less risky migration path.  It would also have attracted new customers over IBM's and Red Hat's operating systems, particularly as server ecosystems transition to the cloud.  Yet, in reality – because the market is not well-functioning, but distorted – scaling and licensing OpenServer 10 has been much more challenging than it would otherwise have been.

160.    In general, entry of new server operating system products into the market and expansion of existing server operating system products—such as Xinuos' OpenServer and UnixWare products—has been thwarted due to the resultant overwhelming scale that the agreements between IBM and Red Hat afforded their own operating system ecosystems, such that application developers, hardware manufacturers, and partners only support IBM and Red Hat operating systems and do not support new entrants or the growth of competing operating systems.

161.    IBM has been able to leverage the lock-in, switching costs and the fact that customers would have to take on "extensive work" to move from mainframes either running IBM's operating systems or RHEL, to different competing operating systems altogether.  This is so even though "[o]perating mainframes is . . . more expensive than" deploying servers to competing operating systems in the cloud."  Indeed, "mainframes also lack the ability to rapidly scale features," thus these locked-in mainframe and midrange server consumers are paying more for degraded capabilities.

162.    Even more insidiously, IBM deliberately avoided drawing attention to its technical control over RHEL and its contributions to the Linux kernel, in order to conceal its manipulation of RHEL and Linux generally to its exclusive advantage.

163.    IBM's acceptance of Red Hat and its open source RHEL was a veneer.  IBM is

41

primarily interested in transitioning customers to RHEL because the service and advisory revenue of the transition and the ensuing growth is front-loaded, lucrative and aligned with the expectations of Wall Street.  IBM is not, and never has been, an open source evangelist – in fact, they have made it excessively challenging for FreeBSD to reach a larger audience, as it by virtue would have. IBM's strategy with Red Hat has been expressly to destroy FreeBSD, upon which Xinuos' most recent innovations have been based.  IBM has sought only to control Linux, including through its arrangements with Red Hat, in order to unfairly thwart competition from Linux and others.

164.    Since the merger, IBM even killed a free version of Red Hat Linux called CentOS, which was an admired non-commercial Linux distribution.  IBM clearly does not truly care about the open source community.

165.    By coordinating with Red Hat, IBM ensured that when RHEL was installed in IBM's enterprise customer environments, both Red Hat and IBM could charge higher prices than they would otherwise be able to charge.  For example, a consumer of server operating systems observed that acquiring RHEL meant tacking on support contracts from Red Hat or IBM and "the price can easily jump."  When IBM pre-installed RHEL on its Power-based servers, instead of its own AIX operating system, this enabled Red Hat to carry out a "more than 60% price hike."

166.    The result of IBM and Red Hat's practices has become especially clear since the merger between the two companies.  Within three months of the merger, IBM announced "increases in purchase prices" up to 39% for the AIX for Power operating system.

167.    Since the merger, IBM has also dramatically increased prices across the board on over five-thousand of its on-premise server software products including the AIX operating system, by removing prior volume discounts on support and service fees "for the millions of existing IBM customers" that had discounts.  In its place, IBM increased service and maintenance fees by around

10%, meaning that every year customers now need to pay approximately 20% of the list price. There is no sign that IBM or Red Hat have any intention of changing these practices.

168.     There is an ongoing threat that IBM and Red Hat will be able to increase the prices of RHEL, AIX for Power, z/OS mainframe, and i midrange server operating systems and provide lower quality products, through IBM's and Red Hat's combination and in view of very high switching costs and customer lock-in.  And by excluding Xinuos' operating systems, particularly excluding OpenServer 10 from the cloud environment, consumer choice is reduced.  As one observer noted of the merger "any solution that results in less choice, not more, is a regression." Increasing prices across the board and reducing consumer choice causes injury to consumers.  And contrary to spurring more innovation, after the merger, capital expenditures outlays declined by 25%. Normally companies report an uptrend in such expenditures following a major business combination, but IBM eliminated an incremental $1 billion in the last year. This too is bad for consumers.

169.     All post-merger benefits that IBM and Red Hat have obtained are a consequence of pre-merger anticompetitive agreements.  The agreements between Red Hat and IBM that caused the two companies to sufficiently scale to have significant control in the market and to make it economically unfeasible for new companies to enter the market occurred before the merger, and the two companies are still benefiting from these anticompetitive acts post-merger.  All post-merger anticompetitive acts have built upon, and are merely the continuation of and integrally the same as, the pre-merger anticompetitive acts.  There is a tower of anticompetitive acts that has built over time and the post-merger anticompetitive acts can only be understood as building upon – and therefore essentially entwined with – the prior anticompetitive acts.

170.     IBM and Red Hat cannot save their unlawful merger with any countervailing

factors.  There is no likely entry sufficient to remedy the anticompetitive effects of their merger. And there are no cognizable efficiencies which would offset those effects. The merger should be declared unlawful in violation of at least Section 7 of the Clayton Act, and IBM and Red Hat should be ordered to divest of each other and void all associated agreements between them.

### 4.   Defendants' Bad Acts Have Been Enabled by the Original and Ongoing Infringement.

171.    IBM stealing Xinuos' code has been a key enabler of the foregoing anticompetitive regime, and the stolen code has been used to hurt competition, competitors, and consumers.

172.    IBM was only able to convince Red Hat to join the illicit agreement by promising Red Hat unique technical and business opportunities that the Code made available.  IBM could promote and support Red Hat products due to the technology in the infringed Xinuos code, which enabled RHEL applications to run in IBM's server and operating system environments.  The Code made IBM and Red Hat's shared control of the market all the more powerful.  Similarly, through the infringed Code, IBM was able to harden its AIX operating system, and other operating systems into which AIX is incorporated, in order to better cement its grip on the high-end of the market.

173.    Once at the market helm, Defendants exploited every advantage at their disposal and left no oxygen for competitors.  It was not enough to have just stolen a competitor's technology, IBM had to squeeze every benefit out of that theft that it could.

174.    The outcome has made it impossible for Xinuos to compete on fair terms, and has foreclosed consumers from access to Xinuos' high-quality products.  The outcome is also a deeply dysfunctional market.  High-value products have no means for penetration.  Nascent rivals have no opportunity for growth.  Prices are shooting upwards.  Enough is enough.  IBM and Red Hat have abused their control over the Unix/Linux operating system market for far too long, and intervention is the only way to fix what they have broken.

# CLAIMS FOR RELIEF

## COUNT I (IBM only)

### Copyright Infringement (17 U.S.C. § 101 *et seq.*)

175.    Xinuos repeats and realleges each and every allegation above as if fully set forth herein.

176.    The Code is original and creative.  As a result, it constitutes copyrightable subject matter under the laws of the United States and its Territories.

177.    Xinuos owns valid copyrights in the Code, and the Register of Copyrights has issued certificates of registration for the Code.  Xinuos has complied in all respects with 17 U.S.C. § 101, *et seq.*, and has secured the exclusive rights and privileges in and to the copyrights in the Code.

178.    By its actions, alleged above, IBM has infringed and will continue to infringe the copyrighted Code by, *inter alia*, reproducing, distributing and creating a derivative work using the Code without any authorization or other permission from Xinuos.  IBM's direct infringement of Xinuos' copyrights has been deliberate, willful, and in utter disregard of Xinuos' rights.

179.    Moreover, as IBM's customers clearly infringed Xinuos' copyrights by reproducing and distributing the Code in their use and deployment of IBM's accused products, IBM is contributorily liable for materially and knowingly contributing to its customers' infringement.  Upon information and belief, IBM induced its customers to infringe Xinuos' copyrights in the Code by promoting the infringing products and by promoting use and deployment of the particular features and functionality enabled by infringing Xinuos' copyrights in the Code. IBM knew that customers using and deploying its accused products were unlawfully reproducing and distributing the infringing Code.

180.   As a direct and proximate result of IBM's conduct, Xinuos has been substantially and irreparably harmed in an amount not readily capable of determination.  Unless restrained by this Court, IBM will cause further irreparable injury to Xinuos.

181.   Xinuos is entitled to injunctive relief preventing IBM, its agents, employees, and all other persons acting in concert or participation with it, from engaging in any further infringement of Xinuos.

182.   Xinuos is also entitled to recover from IBM the damages, including attorneys' fees and costs, it has sustained and will sustain, and any gains, profits, and advantages obtained by IBM as a result of its acts of infringement as alleged above.  At present, the amount of such damages, gains, profits, and advantages cannot be fully ascertained by Xinuos, but will be established according to proof at trial.

183.   IBM's infringement is willful as shown herein.  Therefore, Xinuos is also entitled to recover statutory damages and other relief for IBM's willful infringement of the Code.

**COUNT II**

**Sherman Act §§ 2, 3 (15 U.S.C. §§ 2, 3)**

184.   Xinuos incorporates by reference each and every allegation above as if fully set forth herein.

185.   IBM and Red Hat's conduct violates Section 2 of the Sherman Act, which prohibits the "monopoliz[ation of] any part of the trade or commerce among the several States, or with foreign nations."  15 U.S.C. § 2.

186.   IBM and Red Hat's conduct also violates Section 3 of the Sherman Act, which applies Section 2 to the Territories of the United States.

187.   The market for Unix/Linux server operating systems is a valid antitrust market.

188.    IBM and Red Hat, now a single entity, hold monopoly power in the market.

189.    IBM and Red Hat unlawfully maintain their monopoly power in this market through the exclusionary acts described herein.   These exclusionary acts serve no legitimate or procompetitive purpose that could justify their anticompetitive effects.

190.    IBM and Red Hat's conduct affects a substantial volume of interstate commerce and commerce between the States and Territories.

191.    IBM and Red Hat's conduct has substantial anticompetitive effects, including increased prices and costs, lower output, and reduced innovation and quality of product options.

192.    As a market competitor, Xinuos has been harmed by IBM and Red Hat's anticompetitive conduct in a manner that the antitrust laws were intended to prevent.  Xinuos has suffered and continues to suffer harm and irreparable injury, and such harm and injury will not abate until an injunction ending IBM and Red Hat's anticompetitive conduct issues.

193.    To prevent these ongoing harms, the Court should enjoin the anticompetitive conduct complained of herein, and should award Xinuos monetary damages.

## COUNT III

### Sherman Act §§ 1, 3 (15 U.S.C. §§ 1, 3)

194.    Xinuos incorporates by reference each and every allegation above as if fully set forth herein.

195.    IBM and Red Hat's conduct violates Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of a trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, and with foreign nations."  15 U.S.C. § 1.

196.    IBM and Red Hat's conduct also violates Section 3 of the Sherman Act, which applies Section 1 to the Territories of the United States.

197.    The market for Linux/Unix server operating systems is a valid antitrust market.

198.    IBM and Red Hat unlawfully restrain trade in this market through the anticompetitive acts described herein.  These anticompetitive acts serve no legitimate or procompetitive purpose that could justify their anticompetitive effects.

199.    IBM and Red Hat's conduct and unlawful contractual restraints affect a substantial volume of interstate commerce and commerce between the States and Territories.

200.    IBM and Red Hat's conduct has substantial anticompetitive effects, including increased prices and costs, lower output, reduced innovation, and reduced quality of product options.

201.    As a market competitor, Xinuos has been harmed by IBM and Red Hat's unlawful contractual restraints in a manner that the antitrust laws were intended to prevent.  Xinuos has suffered and continues to suffer harm and irreparable injury, and such harm and injury will not abate until an injunction ending IBM and Red Hat's anticompetitive restraints issues.

202.    To prevent these ongoing harms, the Court should enjoin the anticompetitive conduct complained of herein, and should award Xinuos monetary damages.

**COUNT IV**

**Clayton Act § 7 (15 U.S.C. § 18)**

203.    Xinuos incorporates by reference each and every allegation above as if fully set forth herein.

204.    IBM and Red Hat's conduct violates Section 7 of the Clayton Act, which prohibits mergers that "substantially [] lessen competition, or tend to create a monopoly" in any section of the country, including its Territories.  15 U.S.C. § 18.

205.    The market for Linux/Unix server operating systems is a valid antitrust market.

206.    The merger between IBM and Red Hat has substantially lessened competition in the market, and has eliminated actual and potential competition among IBM and Red Hat in the market.

207.    The merger between IBM and Red Hat has resulted in quality degradation and unreasonable pricing pressure in the market.

208.    As a market competitor, Xinuos has been harmed by the merger between IBM and Red Hat in a manner that the antitrust laws were intended to prevent.  Xinuos has suffered and continues to suffer harm and irreparable injury, and such harm and injury will not abate until an injunction is issued.

209.    To prevent these ongoing harms, the Court should enjoin the anticompetitive conduct complained of herein, and should award Xinuos monetary damages.

## COUNT V

### Virgin Islands Antimonopoly Law (11 V.I. St. § 1501 *et seq*.)

210.    Xinuos repeats and realleges each and every allegation above as if fully set forth herein.

211.    IBM and Red Hat have entered into contracts, or have engaged in combinations or conspiracies, for the purpose of allocating or dividing customers, territories, supplies, sales, or markets, functional or geographical, for commodities and services, and have also by contract, combination, or conspiracy with one another unreasonably restrained trade or commerce.

212.    IBM and Red Hat by contract, combination, or conspiracy with one another have unreasonably restrained trade or commerce.

213.    IBM and Red Hat have established, maintained, used, or attempted to acquire monopoly power over substantial parts of trade or commerce of the United States Virgin Islands

for the purpose of excluding competition or of controlling, fixing, or maintaining prices in such trade or commerce.

214.    As a direct and proximate result of IBM's and Red Hat's conduct, Xinuos has been substantially and irreparably harmed in an amount not readily capable of determination.  Unless restrained by this Court, IBM and Red Hat will cause further irreparable injury to Xinuos.

215.    Xinuos is entitled to injunctive relief preventing IBM, its agents, employees, and all other persons acting in concert or participation with it, and Red Hat, its agents, employees, and all other persons acting in concert or participation with it, from engaging in any further conduct that irreparably harms Xinuos or market competition.  Xinuos is also entitled to monetary damages.

## COUNT VI

### Virgin Islands Common Law – Unfair Competition

216.    Xinuos repeats and realleges each and every allegation above as if fully set forth herein.

217.    IBM and Red Hat have engaged in unfair competition through business practices. The unfair competition, described herein, hinders rather than promotes the efficient operation of the market.

218.    IBM and Red Hat have engaged in unfair and exclusionary conduct.  Their conduct lies outside the ordinary course of business and is tainted by fraud or coercion or conduct otherwise prohibited by law.  In doing so, their conduct has materially interfered with Xinuos' ability to conduct its business.

219.    IBM and Red Hat have made false statements to the market.  Their statements amount to deceptive conduct for the purpose of ultimately securing the trade of rival Xinuos, and misappropriating the skill, expenditure, and labor of rival Xinuos.

220.    IBM and Red Hat conspired to restrain trade.  Their coordinated business practices are, and have been for all the reasons stated herein, contrary to honest practice in commercial matters.

221.    IBM and Red Hat have engaged in conduct that violates the essence of fair play in commercial matters, as their conduct is injurious and otherwise unfair, improper, wrongful, and dishonest.

222.    Plaintiff Xinuos has suffered and continues to suffer irreparable damage to its business due to Defendants' interference with Plaintiff's business in order to gain a competitive advantage for their companies.

223.    As a direct and proximate result of IBM's and Red Hat's conduct, Xinuos has been substantially and irreparably harmed in an amount not readily capable of determination.  Unless restrained by this Court, IBM and Red Hat will cause further irreparable injury to Xinuos.

224.    Xinuos is entitled to monetary damages.

## COUNT VII

### Virgin Islands Common Law – Unjust Enrichment

225.    Xinuos repeats and realleges each and every allegation above as if fully set forth herein.

226.    IBM and Red Hat were enriched at Xinuos' expense.

227.    IBM and Red Hat knew and appreciated the fact that they were enriched and benefitted at Xinuos' expense, under circumstances in which equity and good conscience requires that IBM and Red Hat be held liable to Xinuos for the amount of the unjust enrichment.

228.    As a direct and proximate result of IBM's and Red Hat's conduct, Xinuos has been substantially and irreparably harmed in an amount not readily capable of determination.  Unless

restrained by this Court, IBM and Red Hat will cause further irreparable injury to Xinuos.

229.    Xinuos is entitled to monetary damages.

## DEMAND FOR TRIAL BY JURY

Pursuant to Fed. R. Civ. P 38(b), Xinuos demands trial by jury of all issues so triable under the law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Xinuos respectfully requests judgment in its favor and against Defendants as follows:

A.     Find that Defendants have directly and indirectly infringed Xinuos' copyrights in the Code;

B.     Find that Defendants' infringement of Xinuos' copyrights was willful;

C.     Find that there is a substantial likelihood that Defendants will continue to infringe Xinuos' copyrights unless enjoined from doing so;

D.     Issue a preliminary and permanent injunction enjoining Defendants, and their agents, servants, employees, attorneys, successors and assigns, and all persons, firms and corporations acting in concert with them, from directly or indirectly infringing Xinuos' copyrights, including, but not limited to, offering Defendants' infringing products;

E.     Order the removal and destruction of Xinuos' code from Defendants' infringing products;

F.     Order Defendants to render a full and complete accounting to Xinuos for Defendants' profits, gains, advantages and the value of the business opportunities received from the foregoing acts of infringement;

G.     Enter judgment for Xinuos against Defendants for all damages suffered by Xinuos and for any profits or gain by Defendants attributable to infringement of Xinuos' copyrights in amounts to be determined at trial;

H.     Enter judgment for Xinuos against Defendants for statutory damages based upon Defendants' willful acts of infringement pursuant to 17 U.S.C. § 504;

I.     Adjudge the merger of IBM and Red Hat to have violated Section 7 of the Clayton

Act and Section 1503 of the Virgin Islands Monopolies and Restraints of Trade Act, the common law of unfair competition and the common law of unjust enrichment, and permanently enjoin the parties from continuing as a merged company, or entering into any similar agreements or understandings;

J.      Find that Defendants are wrongfully engaged in contracts, combinations and conspiracies in restraint of trade in violation of Sections 1 and 3 of the Sherman Act and award Xinuos treble damages in an amount to be proven at trial, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a);

K.      Find that Defendants are wrongfully engaged in monopolization, attempted monopolization and conspiracy to monopolize the relevant market in violation of Sections 2 and 3 of the Sherman Act and award Xinuos treble damages in an amount to be proven at trial, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a);

L.      Find that Defendants are wrongfully engaged in contracts, combinations and conspiracies that unreasonably restrain trade and allocates or divides customers, territories, supplies, sales, or markets, functional or geographical, for a commodity or service, in violation of Section 1503 of the Virgin Islands Monopolies and Restraints of Trade Act, the common law of unfair competition and the common law of unjust enrichment, and award Xinuos treble damages in an amount to be proven at trial, pursuant to Section 1507 of the Virgin Islands Monopolies and Restraints of Trade Act, 11 V.I.C. § 1507 and the common law;

M.      Find that Defendants have established, maintained, used, or attempted to acquire monopoly power over substantial parts of trade or commerce for the purpose of excluding competition or of controlling, fixing, or maintaining prices in such trade or commerce, in violation of Section 1503 of Virgin Islands Monopolies and Restraints of Trade Act, the common

law of unfair competition and the common law of unjust enrichment, and award Xinuos treble damages in an amount to be proven at trial, pursuant to Section 1507 of the Virgin Islands Monopolies and Restraints of Trade Act, 11 V.I.C. § 1507 and the common law;

N.      Enter judgment for Xinuos against Defendants for all damages suffered by Xinuos and for any profits or gain by Defendants attributable to violations of Sections 1, 2 and 3 of the Sherman Act, the Virgin Islands Monopolies and Restraints of Trade Act, the common law of unfair competition or the common law of unjust enrichment in amounts to be determined at trial;

O.      Grant injunctive relief prohibiting Defendants and all persons, firms and corporations acting on their behalf or under their direction or control from engaging in any further conduct unlawful under Sections 1, 2 and 3 of the Sherman Act, the Virgin Islands Monopolies and Restraints of Trade Act, the common law of unfair competition and the common law of unjust enrichment;

P.      Award Xinuos attorney's fees and costs of the action, including reasonable attorneys' fees and costs pursuant to 17 U.S.C. § 505 and 15 U.S.C. § 15.

Q.      Award Xinuos' pre-judgment and post-judgment interest, to the fullest extent available, on the foregoing; and

R.      Award Xinuos such other, further and different relief as may be necessary or appropriate, under any applicable principle in law or equity.

Respectfully submitted,

*/s/ J. Daryl Dodson*
J. Daryl Dodson

V.I. Bar No. 241
MOORE, DODSON & RUSSELL, P.C.
P.O. Box 310
5035 Norre Gade, Suite 201
St. Thomas, VI 00804
340.777.5490 (o)
340.777.5498 (f)
daryl@mdrvi.com

*Attorney for Plaintiff Xinuos Inc.*

Dated: March 31, 2021